**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Marriage of | No. 55520-4-II |
| PATRICIA A. PRICE, | |
| Respondent, | |
| and | UNPUBLISHED OPINION |
| THOMAS W. PRICE, | |
| Appellant. | |

MAXA, J. – Tom Price appeals the trial court's (1) orders striking his pleadings and preventing him from presenting evidence at trial as sanctions for discovery violations after considering the *Burnet*[1] factors, and (2) award of lifetime maintenance of $13,000 per month to his former wife, Patricia Price.

This appeal arises out of a dissolution proceeding in which the primary issue before the trial court was the amount in maintenance to award Patricia[2] based on Tom's income. Patricia was a stay-at-home mother for the course of their nearly 30-year marriage, while Tom generated extensive income to support the couple's high standard of living. Throughout the course of the proceeding, Tom failed to meaningfully respond to discovery requests seeking information about

---

[1] *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997).

[2] The parties' first names are used for clarity. We mean no disrespect.

his income from various business ventures. And then he ignored court orders requiring him to fully respond to those requests. He also disregarded court orders requiring him to pay spousal support to Patricia and to reimburse her for attorney fees and was subject to two arrest warrants for contempt.

We hold that (1) the trial court properly applied the *Burnet* factors and made adequate findings regarding its consideration of those factors when imposing discovery sanctions against Tom, (2) the trial court did not err in awarding lifetime maintenance of $13,000 per month to Patricia, and (3) Patricia is entitled to her attorney fees on appeal based on Tom's intransigence at trial.

Accordingly, we affirm the trial court's imposition of discovery sanctions and the spousal maintenance award to Patricia and award her reasonable attorney fees on appeal.

FACTS

*Background*

Patricia and Tom met in college and were married shortly after graduation. They were married for almost 30 years and had three children together. One child remains dependent on Patricia and Tom. At the time of trial, Patricia was 57 years old and Tom was 56 years old.

After college, Patricia worked for two years, but then stayed home to raise their three children. Tom had a lucrative career in real estate investing and was one of the founders for a major commercial real estate company called Prium. Tom controlled all the finances and paid all the bills for the family. Due to Tom's financial success, Patricia and Tom enjoyed a high standard of living, including living in an 11,000 square foot home; owning boats, jet skis, and multiple expensive cars; and traveling around the world.

In 2010, Tom and Patricia declared bankruptcy after Prium encountered severe financial trouble. However, Tom and Patricia continued to live comfortably, still taking extravagant vacations such as traveling to Hawaii and going on cruises to Europe.

Tom began working for Radiance Capital Financial (RCF) in 2016, which involved soliciting money from investors to purchase pools of distressed debt at a discount and then collecting the debt and distributing the profits to the investors. Tom claimed that he was paid only as an employee and had no ownership interest in RCF.

Ed LaCross owned RCF, but did not engage in any management activities. LaCross also created another company called Sparan, LLC, which served as an investment vehicle for a different company called Claire Technologies, LLC. Claire Technologies was a company that produced novel water purification systems. Sparan's purpose was to help Claire Technologies expand its product and distribution. Tom traveled throughout the world to raise capital for Claire Technologies through Sparan. Sparan often reimbursed Tom for his business expenses. Tom claimed that he was paid only as a consultant for Sparan.

The parties disagree about the extent of Tom's role at RCF, Sparan, and Claire Technologies and his compensation from each company. Tom told Patricia that he was making $10,000 a month plus quarterly $15,000 bonuses from RCF and $5,000 a month from Sparan.

*Petition for Dissolution*

In January 2018, Patricia discovered that Tom was having an affair. Based on credit card statements, Patricia found out that Tom regularly traveled with his girlfriend and spent thousands of dollars on her. In contemplation of separating, Tom and Patricia discussed what money would be enough to support Patricia. Tom told Patricia that his net annual income was $210,000, and he proposed a budget of $13,907 per month to be paid by RCF for Patricia's spousal support.

3

In September, Patricia filed a petition for dissolution. Tom filed a response in which he agreed with some of Patricia's allegations and disagreed with others.

*2018 Discovery Requests*

Patricia's and Tom's dissolution proceedings were contentious from the start. Tom remained adamant that he earned only $240,000 a year. Patricia believed that Tom was lying about his income and that he was more than just an employee at RCF, Sparan, and Claire Technologies. Patricia claimed that he was making more than $240,000 a year based on Tom's extravagant spending since working at RCF, such as repeatedly spending thousands of dollars on dinners, up to $25,000 on family vacations, at least $64,000 on his girlfriend, and over $168,000 on other travel related and business expenses.

In September and November of 2018, Patricia sent Tom two sets of interrogatories and requests for production seeking detailed information about Tom's income, business dealings, assets, and expenditures. In September and December, Tom provided responses but claimed he did not have most of the documents requested.

Patricia determined that Tom's discovery responses were inadequate, and she sent a detailed deficiency letter to Tom in March 2019 requesting that he provide complete responses. Her letter asked Tom to provide information regarding his bank accounts from January 2017 through the present; credit card statements from January 2017 through the present; checks written from his father; documentation of any funds borrowed from any person, retirement accounts; documentation related to RCF, Sparan, and Claire Technologies; all expenditures on his girlfriend; and any travel expenses.

Tom provided additional responses, but Patricia determined that the responses still were incomplete. Specifically, Tom produced incomplete bank and credit card statements and refused

4

to produce any documents related to his compensation from RCF, Sparan, and Claire Technologies. When Patricia subpoenaed Tom's credit card documents from American Express, she discovered additional expenditures and credit cards that were not included in the documents that Tom had provided.

In April, Patricia filed a motion to compel discovery and requested $10,000 in attorney fees as a sanction against Tom. Patricia's motion included a number of exhibits, including copies of the discovery requests, discovery answers, the deficiency letter, emails between Patricia's and Tom's attorneys, and Patricia's subpoena costs. Patricia noted in her motion that the subpoenaed documents from American Express showed that Tom had failed to disclose a number of expenditures in his discovery responses.

Tom stated in a declaration that he had fully complied with the discovery requests and that he could not produce any financial documents related to RCF, Sparan, and Claire Technologies because he had no ownership interest in them. Tom also stated that some of the American Express charges were business related and part of his job involved networking with clients.

The trial court presided over the hearing regarding Patricia's motion to compel. Patricia highlighted the inadequacy of Tom's discovery responses, such as illegible check copies, sporadic bank statements, the lack of documents from other credit cards compared to documents received from Patricia's subpoenaed documents, the lack of business reimbursement documents, and the lack of tax returns. The court granted the motion to compel and appointed a special master to oversee discovery. The court reserved ruling on monetary sanctions and declined to make any findings regarding willful nondisclosure.

*Motions for Contempt and Other Motions*

In a separate hearing in April, a court commissioner granted Patricia's motion for a temporary family law order, ordering Tom to pay Patricia $8,500 in spousal support per month retroactive to February and $5,000 in attorney fees. Tom failed to comply with the court's order and Patricia filed a motion for contempt. Tom opposed the motion for contempt and stated in his declaration that he did not have enough money to pay the court ordered spousal support based on his income. Tom also filed a motion to revise the temporary family law order and sought to decrease the amount owed in spousal support and to strike the attorney fees. Patricia continued to claim that Tom was spending his money on himself and his girlfriend rather than complying with court ordered spousal support and attorney fees.

In June, the commissioner heard oral argument on Patricia's motion for contempt and Tom's motion for revision. The commissioner declined to lower the spousal support owed to Patricia and found Tom to be in contempt. The commissioner ordered Tom to pay Patricia the back spousal support of $19,500, $5,000 in attorney fees, and $100 as a civil penalty for being in contempt.

The commissioner noted that Tom had a habit of producing limited financial documents piecemeal at his convenience that allegedly were unavailable before, but suddenly were available after being ordered to produce such documents by the court. The commissioner stated that it was difficult to understand why Tom and Patricia were able to maintain a lavish lifestyle for a long period of time while they were married, but Tom suddenly had no money to support Patricia as soon as they had separated. The commissioner also highlighted the fact that Tom still had not produced any financial documents that supported Tom's claim that his credit card expenditures were purely business related rather than personal.

Tom filed a motion for revision of the commissioner's rulings, which the trial court denied. The court awarded Patricia $25,000 in attorney fees to fund further discovery, highlighting the importance of uncovering where Tom's income was coming from and whether Tom's credit card expenditures truly were business related.

Patricia subpoenaed documents from RCF's bank, asking for RCF's banking records. LaCross and RCF filed a motion to quash the subpoena. In a responsive pleading, Patricia stated,

> Tom[] has obstructed and obfuscated the facts to prevent access to financial records. Although the court appointed a Special Master, there has been no resolution over the outstanding discovery that was initially requested. But, what is clear is that Tom[] is so involved with [RCF] that access to the financial information of [RCF] is crucial to understanding his involvement.

Clerk's Papers (CP) at 2244. The trial court denied the motion to quash.

Tom again failed to comply with the April and June court orders to pay Patricia's spousal support and attorney fees. Patricia filed another motion for contempt, and asked that the trial court order Tom to surrender his passport and place him in jail on the grounds that he had threatened to abscond to Canada.

The commissioner ordered that Tom pay the overdue amounts by July 8 or report to the Pierce County jail. The commissioner also entered an order requiring Tom to appear for a subsequent review hearing on Patricia's motion for contempt on July 15.

Tom did not attend the review hearing in July. Another commissioner awarded $5,000 in attorney fees to Patricia, ordered that Tom surrender his passport, and issued a warrant for his arrest for failure to comply with court orders to pay Patricia.

Tom did not report to jail and did not surrender his passport. In September, Tom paid some of the money owed to Patricia and asked the trial court to quash the warrant for his arrest

and remove the requirement that he surrender his passport. A commissioner granted Tom's motion.

In November, Patricia filed another motion for contempt, stating that Tom still had not complied with the previous court orders to timely pay spousal support and attorney fees. Tom opposed Patricia's motion, stating that his income from RCF and Sparan had declined. He stated that he no longer was receiving a $15,000 quarterly bonus from RCF and that he no longer was getting paid by Sparan. The commissioner found Tom in contempt and awarded Patricia $3,000 in attorney fees and another $100 as a civil penalty.

Tom continued to defy the court orders to comply with spousal support orders and in February 2020, the trial court issued a second warrant for his arrest and a requirement to surrender his passport. The warrant for his arrest remained outstanding at the time of trial.

*2020 Discovery Requests*

On February 3, Patricia sent supplemental discovery requests to Tom. These discovery requests are not in the record. Tom did not respond to Patricia's discovery requests.

Later that month, Tom's attorney filed a notice of intent to withdraw as Tom's attorney because Tom had not paid him. The trial court granted the motion to withdraw.

Patricia's attorney sent two emails to Tom and left a voicemail message on his phone, attempting to discuss the outstanding discovery. Tom did not respond.

In April, Patricia filed a motion to compel discovery, requesting an order compelling Tom to respond to overdue discovery requests and striking Tom's pleadings as a sanction if he failed to provide responses by a certain date. The attorney's supporting declaration referenced the February 2020 discovery requests, but also stated more generally that Tom "continually refuses to provide discovery, or if any discovery is provided it is insufficient, inadequate, or

incomprehensible." CP at 2046. The declaration noted that the trial court had awarded $25,000 "related to discovery, due to the complexity of [Tom's] business dealings and personal dealings." CP at 2046. The declaration also stated that Tom had not paid the $25,000 or any of the other sanctions and attorney fees awarded to Patricia. Neither the motion nor the declaration attached the February 2020 discovery requests.

The trial court presided over the hearing on Patricia's motion to compel on April 17. Tom did not respond to the motion to compel and failed to appear for the hearing. The court granted Patricia's motion to compel and awarded Patricia $2,500 in attorney fees, finding that Tom had "failed to comply with discovery all along the line here." Report of Proceedings (RP) (Apr. 17, 2020) at 5. The court's order required Tom to "respond to the discovery that is outstanding, completely, fully, and without redaction" by April 28. CP at 2296. The order stated that if Tom did not fully respond, he would be given an additional five days to correct any deficiencies. The court declined to strike Tom's pleadings as a sanction at that time.

*Motion to Strike Tom's Pleadings*

Tom failed to comply with the trial court's order compelling discovery responses, and Patricia filed a motion to strike his pleadings as a sanction. Tom, representing himself, did not respond to Patricia's motion and failed to attend the motion hearing. At the hearing, the court discussed the *Burnet* factors and memorialized its *Burnet* findings in a written order. The court stated the following at the hearing:

> It does appear that [Tom] is not only in violation of the Court's previous orders with respect to discovery, but he's just absolutely way outside the lines on any of this. He is not cooperating whatsoever.
>
> I think under the circumstances, it is reasonable because this does appear to be a willful and deliberate refusal to obey the discovery rules. Given what appears to be the financial dimensions of this marital estate, it seems to me that this does

substantially prejudice [Patricia's] ability to prepare for trial. I can't think of any other sanction that would work since we have tried other sanctions already.

So in light of all of that, it does seem to me that it does appear reasonable to strike his pleadings. It is always regrettable to do that, but I don't see much alternative.

RP (May 8, 2020) at 3-4.

The trial court's written findings stated,

The Court has weighed the *Burnet* factors and holds that (1) [Tom's] refusal to obey the discovery orders was willful or deliberate; (2) [Tom's] actions substantially prejudice [Patricia's] ability to prepare for trial; and (3) the Court has explicitly considered whether a lesser sanction would have sufficed, and determined that in light of [Tom's] disregard of prior sanctions as well the Order to Compel Discovery entered April 17, 2020, in this matter, lesser sanctions would not suffice.

CP at 2062.

*Pretrial Motions Regarding Sanctions*

Tom eventually retained new counsel two weeks before trial. One week before trial, he produced a number of financial documents related to RCF, Sparan, and Claire Technologies and additional bank statements.

Tom filed a motion to vacate the trial court's order striking his pleadings. He argued in the motion that the court's *Burnet* findings were inadequate. Patricia filed a motion to prohibit Tom from introducing evidence and testifying at trial. The motion stated that there was no useful purpose in allowing Tom to introduce evidence because his pleadings had been stricken and allowing Tom to testify would diminish the discovery sanction.

The trial court addressed both motions on the first day of trial. In response to Tom's argument that the *Burnet* findings were inadequate, the court emphasized that "part of the problem is that [Tom] didn't respond whatsoever" to Patricia's discovery requests and that "in order to know what the impact of the discovery is, you have to sort of know what it is, don't you?" RP (Aug. 6, 2020) at 12-13. The court stated, "it's hard to know what the prejudice is

until you know what the document is. We don't know what it is when you don't respond to it." RP (Aug. 6, 2020) at 13. In addition, the court stated that it was "hard to know what a lesser sanction might be when we are getting absolutely no response whatsoever from [Tom]" and pointed out that it already gave Tom additional time to provide discovery before striking his pleadings. RP (Aug. 6, 2020) at 13.

The court noted that Patricia was alleging that "there was conduct with respect to the financial records of the parties such that [Tom] was hiding his financial condition." RP (Aug. 6, 2020) at 16. The court stated,

> The request for the documents had to do with precisely that, and -- and I can't imagine a more sort of fundamental need for discovery in a dissolution of marriage action than the financial records of the parties because the biggest thing that we're trying to do is to determine the economic circumstances the parties have and try to do an equitable division of the property and the debts.

RP (Aug. 6, 2020) at 16-17. The court emphasized that "there are vast numbers of -- fairly vast numbers of money that has actually been spent. So where is that coming from?" RP (Aug. 6, 2020) at 17.

Regarding lesser sanctions, the trial court explained that its initial lesser sanction was giving Tom several more weeks to respond to the discovery requests. When Tom's attorney suggested that a lesser sanction could have been financial terms, the court responded:

> He wasn't paying the maintenance as it was. That's kind of a silly . . . [.] What I'm trying to really, I suppose, illustrate is that there is no reasonable lesser sanction. Money wasn't going to make a difference. He wasn't paying the support. Money wouldn't have necessarily compelled him to do what he was supposed to do. He was already supposed to pay support. He wasn't doing that.

RP (Aug. 6, 2020) at 21.

11

The trial court granted Patricia's motion to prevent Tom from presenting evidence at trial, but allowed Tom to cross-examine witnesses and challenge exhibits. The court stated that Tom's discovery violations possibly gave him an advantage at trial

> [b]ecause if he had disclosed all of these materials, maybe then [Patricia's attorney] would have had an ability to debunk all of his claims of what his current income is if it's something different from what it was in 2017 or 2018, something lesser. Without having that information, how is he supposed to respond to it? How is he supposed to react to it? How is he supposed to counter it? How is he supposed to provide some other information that says, "No, that's not true"?

RP (Aug. 6, 2020) at 28-29.

Tom mentioned that he recently had produced a number of documents, but the trial court noted that the production came late. The court also noted that nobody had filed a motion to continue the trial, but Tom emphasized that he needed to have the case tried and he was not in a position to request a continuance.

*Bench Trial*

At trial, RCF's bookkeeper testified about RCF's structure and Tom's involvement. She testified that Tom instructed her on what bills to pay and approved payroll. LaCross had no responsibilities at RCF. Tom also was in charge of Sparan. Either Tom or his business partner made all financial related decisions, including when money was loaned from one company to another. Tom used RCF's debit card to pay his rent, for his luxury vehicle, for meals worth a few thousand dollars a month, and other expenses.

Sara Hussey, Patricia's expert witness, testified that Patricia hired her to investigate Tom's financial documents and to uncover Tom's income and the source of his income. Hussey stated that RCF's business model was very viable and generally successful based on the records available between 2016 and 2019. She estimated that RCF produced a free cash flow of somewhere in the million dollar a year range after paying payroll and overhead costs. She stated

that her investigation showed that RCF was a source of funds for Tom to support his lifestyle and that Tom had control over the company.

Hussey testified that Sparan was another source of funds for Tom and that Tom used a fair amount of Sparan's funds to support his lifestyle. Hussey stated that based on the documents available to her starting from 2016, she estimated that Tom had an annual income of $640,000. Hussey noted that she did not have complete records for 2019 and 2020 to date.

Patricia testified to the facts above and about the standard of living when she was married to Tom and before and after they declared bankruptcy. She stated that after the separation, she had to rely on her friends for housing, transportation, and food. Patricia testified that she was in poor health without the medication that Tom used to pay for and that she had headaches, a lack of energy, and backaches. She also stated that she could no longer afford her medication or the biannual blood tests. In her trial brief, Patricia requested $25,000 a month in spousal maintenance for the term of her life.

After Patricia's testimony, the trial court contemplated allowing Tom to testify. The court ultimately adhered to its earlier ruling and stated that there was no alternative but to prevent Tom from presenting evidence. The court repeated that Tom "wasn't going to be persuaded by the threat of jail with warrants for his arrest. He wasn't going to be persuaded by requirements to pay more money because he was already not paying his spousal maintenance." RP (Aug. 18, 2020) at 690.

*Trial Court Ruling*

The trial court provided a detailed oral ruling. The court stated that it was within its discretion to award spousal maintenance to Patricia based on the statutory factors in RCW 26.09.090. The court noted in particular that Patricia's ability for self-support was a factor and

that Tom and Patricia's standard of living during their marriage and their post-dissolution economic conditions were paramount concerns.

The trial court also stated that the evidence showed that Tom's cash flow was $600,000 a year, and that a fair amount of that cash flow likely was based on illegitimate business expenses. The court determined that Tom's gross income likely was $400,000 and believed that based on that income, he could afford to pay Patricia $13,000 a month in spousal maintenance until her death or remarriage. The court stated that this amount was modifiable based on a change of circumstances if Tom could document substantial reduction in his income.

The trial court entered detailed findings of fact and conclusions of law regarding the dissolution and the maintenance award, and also expressly incorporated its oral opinion. Regarding Tom's income, the court found:

> [Tom] . . . has kept his income and his personal and business assets hidden. His failure to cooperate with and to provide discovery was evidenced in an order of this court striking his pleadings dated and filed herein May 8, 2020. But the evidence established [Tom] had access to cash flow of at <u>minimum</u> $1,279,000 over the most recent 2-year period for which data can be located. Much of [Tom's] income being received as personal living expenses paid as business expenses. Ms. Hussey estimated about 70% of [Tom's] income escaped taxation by being paid in this manner.

CP at 2193. The court also found that when the parties contemplated separation in 2018, Tom proposed a payment to Patricia of at least $13,907 per month to be paid by RCF.

The court stated that it had considered all the statutory factors for awarding maintenance set forth in RCW 26.09.090. The court found that Patricia had not worked outside the home in many years and that Tom originally had proposed paying Patricia $13,907 a month in spousal maintenance when they first separated. The court found that Tom had the benefit of more than $50,000 a month and that he had acknowledged a gross income of more than $20,000 a month. The court found that even though Patricia claimed monthly living expenses of $23,600, she

should be able to curb her spending to $13,000 a month and Tom should be able to pay that amount in maintenance.

The trial court found that Patricia needed help to pay her attorney fees and costs and ordered Tom to pay Patricia's attorney fees and costs. The court found that Tom had been intransigent and that his behavior caused Patricia to incur significant attorney fees and costs.

In the final dissolution decree, the trial court ordered Tom to pay maintenance in the amount of $13,000 per month, and stated that support would terminate only upon Patricia's remarriage or death. The court also ordered Tom to pay $165,000 for Patricia's attorney fees and $54,000 for her expert fees.

Tom appeals the trial court's orders to strike his pleadings and to prevent him from providing evidence at trial and the award of lifetime maintenance to Patricia.

## ANALYSIS

A. IMPOSITION OF SANCTIONS

Tom argues that the trial court erred in striking his pleadings and preventing him from presenting evidence as sanctions for failing to respond to discovery and violating the court's order to produce discovery. Specifically, he claims that the court erred in (1) finding that two of the *Burnet* factors – substantial prejudice and no lesser sanctions – supported the imposition of sanctions, and (2) entering inadequate findings regarding the *Burnet* factors. We disagree.

1. Legal Principles

CR 26 provides for broad discovery from the opposing party. *Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 584, 220 P.3d 191 (2009). Absent a protective order under CR 26(c), a party is required to answer or object to an interrogatory or a request for production. *Id.* A party

cannot simply ignore or fail to respond to a discovery request. *Id.* "[A]n evasive or misleading answer is to be treated as a failure to answer." CR 37(d).

Under CR 37(b)(2), the trial court has discretion to impose sanctions against a party who fails to comply with a discovery order. Available sanctions include excluding evidence and striking pleadings. CR 37(b)(2)(B), (C). CR 37(d) also allows the trial court to impose the sanctions allowed under CR 37(b)(2) for the failure of a party to respond to interrogatories or requests for production. *Magaña*, 167 Wn.2d at 584. The trial court generally should impose the least severe sanction that will adequately serve the purposes of sanctions, which are to compensate the harmed party, deter, punish, educate the wrongdoer, and ensure that the wrongdoer does not profit from the wrong. *Barton v. Dep't of Transp.*, 178 Wn.2d 193, 215, 308 P.3d 597 (2013).

Before a trial court can impose one of the "harsher remedies" for a discovery violation under CR 37(b), it must explicitly consider the *Burnet* factors: (1) whether the violation was willful or deliberate, (2) whether the violation substantially prejudiced the opposing party's ability to prepare for trial, and (3) whether lesser sanctions probably would suffice. *Jones v. City of Seattle*, 179 Wn.2d 322, 338, 314 P.3d 380 (2013). The "harsher remedies" include those sanctions described in CR 37(b)(2). *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 688, 132 P.3d 115 (2006).

The trial court must make express findings regarding the *Burnet* factors on the record. *Teter v. Deck*, 174 Wn.2d 207, 217, 274 P.3d 336 (2012). These findings may be made orally or in writing, either in a "contemporaneous" recorded finding or in the order itself. *Id.* And "a colloquy might satisfy *Burnet* in substance even if the judge fails to invoke that case by name." *Jones*, 179 Wn.2d at 344. The court in *Teter* stated, "We cannot emphasize too forcefully the

16

importance of adequate findings to support more severe discovery sanctions such as exclusion of a witness." *Teter,* 174 Wn.2d at 210.

We review the trial court's order of discovery sanctions for abuse of discretion. *Barton*, 178 Wn.2d at 214. The trial court has wide latitude in fashioning the appropriate sanction for discovery abuse. *Id.* at 215. A finding of abuse of discretion requires a clear showing that the trial court was manifestly unreasonable in exercising its discretion or exercised its discretion on untenable grounds or for untenable reasons. *Id.* And a trial court's failure to properly consider the *Burnet* factors is subject to a harmless error analysis. *See Jones*, 179 Wn.2d at 356.

2.      Application of *Burnet* Factors

Tom concedes for purposes of this appeal that the first *Burnet* factor is not at issue because the record supports the trial court's finding that he willfully or deliberately failed to comply with the trial court's April 2020 order to respond to Patricia's discovery requests. However, he argues that the trial court could not have adequately considered the second and third *Burnet* factors without first seeing the unanswered supplemental discovery requests. We disagree.

a.      Substantial Prejudice

Tom argues that without seeing the February 2020 supplemental discovery requests, the trial court had no way of knowing that the requests were for material information. He claims that the requests could have been for trivial or extraneous matters, in which case the failure to respond could not have caused substantial prejudice. It certainly would have been preferable for counsel to attach the February 2020 supplemental discovery requests in his motion to compel. However, the record shows that the trial court was aware of the nature of the outstanding discovery.

17

First, Patricia's motion to compel was not specifically limited to the supplemental requests. The motion did not reference the February 2020 discovery requests, the attorney's supporting declaration mentioned those requests only once, and as noted those requests were not even included in the motion. The declaration alluded to all of the outstanding discovery requests, including those in the record from 2018, when it stated that Tom "*continually* refuses to provide discovery" and "*if any discovery is provided* it is insufficient, inadequate, or incomprehensible." CP at 2046 (emphasis added). Because Tom did not respond at all to the February 2020 requests, this latter statement necessarily refers to the previous discovery requests, which were in the record. The declaration also referenced the trial court's June 2019 award of $25,000 for future discovery relating to Tom's "business dealings and personal dealings." CP at 2046.

Second, the trial court record showed that Tom had not adequately responded to the 2018 discovery requests. In June 2019, Patricia's attorney stated, "Tom Price has obstructed and obfuscated the facts to prevent access to financial records. Although the court appointed a Special Master, there has been no resolution over the outstanding discovery that was initially requested." CP at 2244. Nothing in the record indicates that Tom provided any additional responses to the 2018 discovery requests between June 2019 and the sanctions hearing.

Third, in February 2020 Patricia sent Tom *supplemental* discovery requests. The trial court reasonably could have assumed that these discovery requests supplemented the 2018 requests, which were in the record.

Fourth, the trial court interpreted Patricia's April 2020 motion to compel as referring to all the previous discovery requests. The court found that Tom had "failed to comply with discovery *all along the line here*." RP (Apr. 17, 2020) at 5 (emphasis added). And the court's

18

discovery order did not mention the February 2020 supplemental discovery requests. Instead, the court's order generally required Tom to "respond to the discovery that is outstanding." CP at 2296.

Finally, the court's imposition of sanctions did not relate only to the April 2020 order to compel. The court in both its oral ruling and written order referred to the violation of discovery *orders*, plural. The court necessarily was referring not only to the April 2020 discovery order, but to the previous discovery orders.

The 2018 discovery requests sought detailed information about Tom's income, business dealings, assets, and expenditures. A reasonable inference is that the February 2020 supplemental requests sought similar information. And we conclude that the record supports the trial court's finding that the failure to provide this financial information substantially prejudiced Patricia.

b.    Lesser Sanctions

Tom argues that the trial court could not determine whether lesser sanctions would suffice without knowing the content of the supplemental requests. This argument fails for the reasons stated above regarding substantial prejudice.

In addition, the record supports the trial court's finding that no lesser sanctions would suffice. Monetary sanctions obviously did not work; Tom repeatedly failed to pay sanctions the trial court imposed for previous violations of court orders. Threats of arrest and jail time obviously did not work; Tom ignored a previous court order to report to jail and there was an outstanding warrant for his arrest at the time sanctions were imposed. And Tom still had not produced discovery that Patricia needed to present her case.

We conclude that the record supports the trial court's finding that lesser sanctions would not suffice.

3. Adequacy of Findings

Tom argues that even if the record supported findings that there was substantial prejudice and no lesser sanctions would suffice, the trial court's *actual* findings were inadequate. Specifically, he claims that the trial court's *Burnet* findings were inadequate because they did not (1) explain how his failure to respond to discovery caused substantial prejudice, and (2) expressly identify any lesser sanctions the court considered. We disagree.

Tom relies on *Marina Condominium Homeowner's Association v. Stratford at the Marina, LLC*, 161 Wn. App. 249, 254 P.3d 827 (2011). In that case, the trial court entered a default judgment as a discovery sanction. *Id.* at 259. The court's order stated that the moving party " 'was significantly prejudiced' " by the discovery violations and that " '[t]he Court has considered lesser sanctions and found them to be inadequate.' " *Id.* at 261 (quoting trial court order). The appellate court held that these findings were inadequate because "the trial court failed to make a clear record in the order containing its reasoning in reaching those conclusions." *Id.*

Here, although they were sparse, the trial court made oral and written *Burnet* findings to support striking Tom's pleadings. The court orally stated, "Given what appears to be the financial dimensions of this marital estate, it seems to me that this does substantially prejudice [Patricia's] ability to prepare for trial. I can't think of any other sanction that would work since we have tried other sanctions already." RP (May 8, 2020) at 4. The written findings were: "(2) [Tom's] actions substantially prejudice [Patricia's] ability to prepare for trial; and (3) the Court has explicitly considered whether a lesser sanction would have sufficed, and determined that in

20

light of [Tom's] disregard of prior sanctions as well the Order to Compel Discovery entered April 17, 2020, in this matter, lesser sanctions would not suffice." CP at 2062.

The trial court's findings were slightly more detailed than those in *Marina Condominium*. But we do not read *Marina Condominium* as requiring extensive findings in all cases. Standing alone, the trial court's May 2020 findings may have been adequate. Because spousal maintenance was the key issue in the case, the prejudice caused by Tom failing to produce meaningful financial information was obvious. And as the trial court noted, Tom's complete failure to comply with court orders and make required monetary payments despite contempt orders and even arrest warrants made it clear that lesser sanctions would not suffice.

However, even if the trial court's initial findings were not adequate, the court made more extensive findings in August 2020 in a colloquy with Tom's attorney when addressing Tom's argument that the May 2020 findings were inadequate and Patricia's motion to preclude Tom from presenting evidence at trial.

Regarding substantial prejudice, the trial court stated affirmatively on the record that the lack of discovery responses impacted Patricia's ability to discover and question Tom's income. The court stated that Patricia was alleging that "there was conduct with respect to the financial records of the parties such that [Tom] was hiding his financial condition." RP (Aug. 6, 2020) at 16. The court found,

> The request for the documents had to do with precisely that, and -- and I can't imagine a more sort of fundamental need for discovery in a dissolution of marriage action than the financial records of the parties because the biggest thing that we're trying to do is to determine the economic circumstances the parties have and try to do an equitable division of the property and the debts.

RP (Aug. 6, 2020) at 16-17. The court emphasized that Patricia was unable to determine where

the "fairly vast numbers of money that has actually been spent" was coming from. RP (Aug. 6,

2020) at 17.

The court continued with the following comment:

[I]f [Tom] had disclosed all of these materials, maybe then [Patricia's attorney] would have had an ability to debunk all of his claims of what his current income is if it's something different from what it was in 2017 or 2018, or something lesser. Without having that information, how is he supposed to respond to it? How is he supposed to react to it? How is he supposed to counter it? How is he supposed to provide some other information that says, "No, that's not true"?
. . . .

As I said before, if -- by obscuring the discovery process, [Tom] may well be getting an advantage here because there is not an ability to challenge whatever evidence he is coming up with now.

RP (Aug. 6, 2020) at 28-30. This comment follows the earlier finding that "[g]iven what appears

to be the financial dimensions of this martial estate, it seems to me that this does substantially

prejudice [Patricia's] ability to prepare for trial." RP (May 8, 2020) at 4.

Regarding lesser sanctions, the only lesser sanction that Tom suggested was financial

terms. The court stated,

He wasn't paying the maintenance as it was. That's kind of a silly . . . [.] What I'm trying to really, I suppose, illustrate is that there is no reasonable lesser sanction. Money wasn't going to make a difference. He wasn't paying the support. Money wouldn't have necessarily compelled him to do what he was supposed to do. He was already supposed to pay support. He wasn't doing that.

RP (Aug. 6, 2020) at 21. This finding follows the earlier finding that "I can't think of any other

sanction that would work since we have tried other sanctions already." RP (May 8, 2020) at 4.[3]

---

[3] The trial court also stated that giving Tom more time to respond to discovery requests rather than immediately striking his pleadings was a lesser sanction. We agree with Tom that this ruling was not a sanction.

Tom makes four arguments regarding the adequacy of the trial court's findings. First, he argues that the August 2020 findings could not support the striking of Tom's pleadings because they were not made at the time that sanction was imposed. He relies on *Blair v. TA-Seattle East No. 176*, 171 Wn.2d 342, 254 P.3d 797 (2011). In that case, the trial court imposed sanctions in an August 14 order and imposed additional sanctions in an October 15 order, but neither order mentioned the *Burnet* factors. *Id.* at 346-47, 348. The proponent of the sanctions argued that the latter order showed that the court had at least considered lesser sanctions. *Id.* at 349.

The appellate court in *Blair* stated, "The August 14 order needed to be supportable *at the time it was entered*, not in hindsight by reference to the October 15 order" and "the August 14 order needed to set forth findings under *Burnet* independent of the later-entered October 15 order." *Id.* at 350. In a footnote, the court stated that it would "not allow the trial court to make after-the-fact findings supporting its August 14 and October 15 orders." *Id.* at 352 n.6.

*Blair* is factually distinguishable. In *Blair*, the court noted that the trial court had failed to enter findings on the record regarding any consideration of the *Burnet* factors. *Id.* at 350. Here, the trial court clearly considered all the *Burnet* factors and the court's May 2020 sanction order made express findings regarding the *Burnet* factors. The August colloquy merely supplemented those findings. And the August colloquy directly related to the adequacy of those findings as well as to Patricia's motion for additional sanctions. Finally, the colloquy was the first time that Tom had the opportunity to discuss the *Burnet* factors because he did not appear at the May hearing; the colloquy essentially was a continuation of that hearing. We conclude under the specific facts of this case that the trial court's August 2020 findings could be used to support both the May and August sanctions.

Second, Tom argues that the trial court did not make any written *Burnet* findings specific to the court's decision at the beginning of trial to bar him from testifying or presenting evidence. But as noted above, a trial court may make *Burnet* findings orally. *Teter*, 174 Wn.2d at 217. As discussed above, the trial court's oral findings before excluding Tom's testimony was sufficient and showed a careful consideration of each *Burnet* factor.

Third, Tom argues that the trial court failed to identify the exact discovery material that Patricia needed for trial. However, the court made it clear that the materials Patricia needed were Tom's financial records, and they were needed because of the allegation that he was hiding his financial condition. Tom provides no authority for the proposition that a trial court must refer to specific missing documents in its *Burnet* findings.

In addition, the trial court noted that it was difficult to provide detailed substantial prejudice and lesser sanctions findings because Tom never responded to Patricia's discovery requests in any manner. The court stated,

> It's kind of hard to do that in a vacuum, isn't it, of not having the discovery, and then you're supposed to know -- in order to know what the impact of the discovery is, you have to sort of know what it is, don't you?
> . . . .
>
> You are saying well, what's your prejudice? Well, it's hard to know -- I suppose on some level, it's hard to know what the prejudice is until you know what the document is. We don't know what it is when you don't respond to it.
>
>    And let me add one other thing, which is where I was kind of going with my question, which was – which is where I mean to go with this question. It's hard to know what a lesser sanction might be when we are getting absolutely no response whatsoever from [Tom].

RP (Aug. 6, 2020) at 13.

Fourth, Tom argues that his failure to pay spousal support could not be used as evidence that lesser sanctions would not suffice because spousal support was not a sanction and he could

not afford to pay the ordered support. But the record also showed that Tom had failed to pay other discovery and contempt sanctions and the $25,000 the trial court ordered that he pay Patricia for future discovery. In addition, there were arrest warrants issued for his continued contempt of court orders. And the trial court reasonably could determine that if Tom had ignored prior orders and warrants requiring him to pay money to Patricia, he likely would ignore monetary discovery sanctions as well.

We conclude that the trial court's oral and written findings were adequate to establish that Tom's failure to provide discovery substantially prejudiced Patricia and that lesser sanctions would not suffice. Those findings also show that the court carefully considered the *Burnet* factors. Accordingly, we hold that the trial court did not err when it struck Tom's pleadings and precluded him from presenting evidence at trial.

### B. MAINTENANCE AWARD

Tom argues in the alternative that the trial court erred in making the maintenance award to Patricia. We disagree.

#### 1. Legal Principles

RCW 26.09.090(1) provides a nonexclusive list of factors that must be considered on the issue of maintenance:

> (a) The financial resources of the party seeking maintenance . . . and his or her ability to meet his or her needs independently . . . ;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
> (c) The standard of living established during the marriage or domestic partnership;
> (d) The duration of the marriage or domestic partnership;
> (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
> (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

25

Although the trial court must consider the factors listed in RCW 26.09.090(1), it does not need to make specific factual findings on all of the factors. *In re Marriage of Anthony*, 9 Wn. App. 2d 555, 564, 446 P.3d 635 (2019).

An award of maintenance "is not just a means of providing bare necessities, but rather a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984). "Ultimately, the court's main concern must be the parties' economic situations postdissolution." *Anthony*, 9 Wn. App. 2d at 564. " 'The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just.' " *Id.* (quoting *In re Marriage of Bulicek*, 59 Wn. App. 630, 633, 800 P.2d 394 (1990)).

Lifetime maintenance generally is disfavored, but may be awarded when the amount is reasonable and " 'it is clear the party seeking maintenance will not be able to contribute significantly to . . . her own livelihood.' " *In re Marriage of Valente*, 179 Wn. App. 817, 822, 320 P.3d 115 (2014) (quoting *In re Marriage of Mathews*, 70 Wn. App. 116, 124, 853 P.2d 462 (1993)).

We review a trial court's award of maintenance for abuse of discretion. *Anthony*, 9 Wn. App. 2d at 563. Trial courts are entitled to broad discretion in awarding maintenance. *Id.* A trial court abuses its discretion if its decisions are manifestly unreasonable or are based on untenable grounds or untenable reasons. *Id.*

We review findings of fact for substantial evidence. *In re Marriage of Leaver*, 20 Wn. App. 2d 228, 238, 499 P.3d 222 (2021). Substantial evidence exists when there is sufficient evidence to persuade a fair-minded person of the finding's truth. *Anthony*, 9 Wn. App. 2d at 564. We do not substitute our judgment for the trial court's judgment, weigh the evidence, or evaluate

witness credibility. *In re Marriage of Wilson*, 165 Wn. App. 333, 340, 267 P.3d 485 (2011). When the trial court has weighed the evidence, we determine only whether substantial evidence supports the findings of fact, and if so, whether the findings support the trial court's conclusions of law. *Id.* We review the trial court's conclusions of law de novo. *In re Marriage of Raskob*, 183 Wn. App. 503, 510, 334 P.3d 30 (2014).

### 2.    Adequacy of Findings

Tom argues that the trial court erred because it failed to make specific findings regarding (1) his actual income during the course of the dissolution proceeding and at trial and (2) Patricia's ability to support herself and whether her health prevented her from working. We disagree.

Regarding his income, Tom relies on *Anthony*, where the appellate court remanded because the trial court did not make any finding regarding the parties' income. 9 Wn. App. at 563. However, the trial court did make an express oral finding that Tom's income was $400,000 per year. The court's oral findings were incorporated into the findings of fact. And the court made an express written finding that Tom had access to a cash flow of at least $1,279,000 for the most recent two-year period for which data was available. Tom asserts that these findings did not reflect his current income, but there was no evidence that Tom's income has decreased before trial.

Tom is correct that the trial court did not make any specific findings regarding Patricia's ability to support herself or to work. However, as noted above, the trial court is not required to make specific factual findings on all of the RCW 26.09.090(1) factors. *Anthony*, 9 Wn. App. 2d at 564. The trial court only needs to *consider* the statutory factors. *Id.* Here, the trial court's

oral ruling and written findings expressly referenced "the spouse's ability for self-support" as a factor to be considered in determining maintenance. RP (Aug. 18, 2020) at 736; CP at 2194.

In addition, the trial court stated in its written findings that Patricia's "financial condition was testified to." CP at 2193. The evidence showed that Patricia's age and limited work experience likely would never allow her to support a lifestyle that she had grown accustomed to during her nearly 30-year marriage. Patricia testified about her poor health, which could prevent her from holding a job when combined with her age and lack of work experience. She stated that Tom used to pay for her medication and biannual blood tests, but when he stopped paying she began having headaches, was lethargic, and had backaches without the medication. Patricia stated that she had no financial ability to pay for her healthcare. The trial court apparently found Patricia's testimony persuasive, and we do not re-weigh testimony on appeal. *Wilson*, 165 Wn. App. at 340.

We conclude that the record shows that the trial court considered Patricia's ability to support herself in determining the amount of maintenance.

3. Substantial Evidence

Tom asserts as an assignment of error that there was no substantial evidence regarding his current income at the time of trial. He emphasizes that no evidence was presented at trial regarding his income for the 19 months before trial because Hussey, Patricia's expert, did not project his income beyond 2017-2018. We disagree.

Hussey provided extensive testimony about Tom's income up until 2018, and she estimated that Tom had an annual income of $640,000. The trial court found that Tom's income was $400,000. A fair minded person could extrapolate the amount of Tom's income based on the other financial documentation relating to his expenses for the years of 2019 and 2020. A

28

reasonable inference was that if Tom's income was $640,000 in 2018, his income still was as high as $400,000 in 2020. Further, Hussey did not have more current financial information *because Tom refused to produce that information.* Tom cannot expect to reap the benefits of his discovery violations by now arguing that there was a lack of evidence of his current income.

We conclude that substantial evidence supported the trial court's findings' regarding Tom's income.

C.      ATTORNEY FEES AWARDED AT TRIAL

Tom assigns error to the trial court's award of attorney fees and expert witness fees to Patricia. However, he provides no legal analysis or authority in support of this assignment of error. Therefore, we do not address his argument. RAP 10.3(a)(6); *Helmbreck v. McPhee*, 15 Wn. App. 2d 41, 68, 476 P.3d 589 (2020), *review denied* 196 Wn.2d 1047 (2021). We affirm the trial court's award of attorney fees.

D.      ATTORNEY FEES ON APPEAL

Patricia requests attorney fees on appeal under RCW 26.09.140 and based on Tom's intransigence.

RCW 26.09.140 gives us discretion to award reasonable attorney fees to either party on appeal "after considering the financial resources of both parties." We must balance the needs of the party requesting attorney fees against the ability of the other party to pay. *In re Marriage of Tupper*, 15 Wn. App. 2d 796, 815, 478 P.3d 1132 (2020). We also consider the merits of the appeal. *Id.* The parties have filed competing declarations disputing the other's income.

"A party's 'intransigence' is an equitable as opposed to statutory basis for awarding attorney fees." *In re Marriage of Chandola*, 180 Wn.2d 632, 656, 327 P.3d 644 (2014). We may award attorney fees based upon the intransigence of one party when he or she has made the

proceedings unduly difficult and increased the legal costs for a case because of such foot-dragging and obstruction in the judicial process. *Id.* at 657. And a party's intransigence in the trial court may support an award of attorney fees on appeal. *In re Marriage of Buchanan*, 150 Wn. App. 730, 740, 207 P.3d 478 (2009).

The trial court awarded attorney fees to Patricia in part based on Tom's intransigence. And there is an overwhelming amount of evidence in the record that shows that Tom refused to comply with discovery rules and court orders. Tom even had an outstanding warrant for his arrest at the time of trial based on his contempt of the court's orders. This appeal derives from Tom's intransigence. We award Patricia her reasonable attorney fees on appeal based on Tom's intransigence at trial.

CONCLUSION

We affirm the trial court's imposition of discovery sanctions and the spousal maintenance award to Patricia.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

WORSWICK, J.

LEE, C.J.